# In the United States Court of Federal Claims

No. 22-460
(Filed Under Seal: October 25, 2022)
(Reissued for Publication: December 2, 2022)[1]

****************************************
ACCELGOV, LLC,                     *
                                        *
           Plaintiff,            *
                                        *
       v.                             *
                                        *     Post-Award Bid Protest; Motion
THE UNITED STATES,            *     for Judgment on the
                                        *     Administrative Record; Unequal
           Defendant,            *     Treatment; Unstated Evaluation
                                        *     Criteria; Best-value Tradeoff.
       and                     *
                                        *
DIRECTVIZ SOLUTIONS, LLC     *
                                        *
           Defendant-Intervenor.    *
****************************************

*W. Brad English*, Maynard, Cooper & Gale, PC, Huntsville, AL, counsel for Plaintiff. With whom were *Jon D. Levin*, *Emily J. Chancey*, *Nicholas P. Greer*, and *Mary Ann Hanke*, of counsel.

*Kelly A. Krystniak*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. *Colin O'Sullivan*, Office of General Counsel, U.S. National Science Foundation, of counsel.

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington, DC, counsel for Defendant-Intervenor. With whom was *Thomas A. Pettit*, of counsel.

## OPINION AND ORDER

**DIETZ, Judge.**

       AccelGov, LLC ("AccelGov") protests a decision by the National Science Foundation ("NSF") to award a Blanket Purchase Agreement ("BPA") for information technology services

---

[1] This Opinion and Order was filed under seal on October 25, 2022, *see* [ECF 34], in accordance with the Protective Order entered on April 28, 2022 *see* [ECF 15]. The parties were given an opportunity to identify protected information, including source selection information, proprietary information, and confidential information, for redaction. The parties filed a joint status report on October 21, 2022, with agreed upon proposed redactions. [ECF 36]. The Court accepts the parties' proposed redactions. All redactions are indicated by bracket asterisks, *e.g.*, "[* * *]."

to DirectViz Solutions, LLC ("DirectViz"). AccelGov challenges the NSF's evaluation of the quotes submitted by AccelGov and DirectViz and its source selection decision as arbitrary and capricious. Based on the administrative record, the Court finds that the NSF's evaluation and source selection decision were reasonable and consistent with the criteria set forth in the Request for Quotes ("RFQ"). Accordingly, AccelGov's motion for judgment on the administrative record is **DENIED**, and the government's and DirectViz's respective cross-motions for judgment on the administrative record are **GRANTED**.

## I. BACKGROUND

### A. Overview of the RFQ and Evaluation Factors

The NSF is a federal agency that "funds research and education in science and engineering . . . through grants, contracts, and cooperative agreements to colleges, universities, and other research and/or education institutions in all parts of the United States." AR 307.[2] On October 4, 2021, the NSF issued a RFQ for information technology customer support services with the intent to award a single BPA. AR 304, 357, 759. The procurement was to be conducted in accordance with the ordering procedures set forth in Federal Acquisition Regulation ("FAR") Subpart 8.4.[3] AR 225, 357. The RFQ contemplated the award of a BPA with a maximum five-year performance period. AR 360. Under the BPA, the NSF could issue orders during the performance period on a firm-fixed price or labor hour basis. *Id*. The NSF estimated that purchases under the BPA during the performance period would total $75,000,000. AR 361.

The RFQ specified five evaluation factors: Past Experience (Factor 1), Key Personnel (Factor 2), Technical Capability (Factor 3), Oral Presentation (Factor 4), and Price (Factor 5). AR 392. The evaluation would be conducted in two phases. *Id*. Phase I of the evaluation would focus on Past Experience, Key Personnel, and Technical Capability, and Phase II would focus on Oral Presentation and Price. *Id*. The RFQ stated that the evaluation factors were listed "in descending order of importance" and that, "[w]hen combined, the non-price factors [were] significantly more important than price." AR 397. It also stated that "[p]rice [would] become increasingly important as the non-price factors become increasingly equal." *Id*.

The Past Experience factor required offerors to submit three example contracts that are relevant to the statement of work. AR 392. The Key Personnel factor required offerors to submit resumes for the following positions: Lead Program Manager, Deputy Program Manager, eBusiness Lead, Operations Manager, and Desktop Manager. AR 393. The Technical Capability factor required offerors to describe their approaches to taking over responsibility for delivery of the support services within sixty days, providing Very Important Person ("VIP") support, and providing eBusiness support. AR 393. After evaluating the Phase I factors, the NSF would advise the most highly rated offerors to proceed to Phase II. AR 394. Offerors who were not among the most highly rated would be advised not to proceed to Phase II because they were not considered to be viable competitors for the BPA award. *Id*.

---

[2] The Court cites to the Administrative Record filed by the government at [ECF 24] as "AR ___."

[3] FAR Subpart 8.4 provides ordering procedures for agencies to place individual orders or establish BPAs for commercial supplies or services under the General Services Administration schedule program. *See* FAR 8.402.

The Oral Presentation factor required offerors to provide presentations responding to a standard set of scenario-based questions. AR 762. Offerors were required to submit their presentation slide deck to the NSF Contracting Officer ("CO") in advance of their oral presentation. AR 395. Offerors were allotted sixty minutes to deliver their oral presentation. *Id*. At the conclusion of the presentation, the NSF evaluation team would meet and determine if they had any questions. *Id*. If they did, the offeror would be given an additional sixty minutes to respond. AR 395-96. Offerors were required to submit their pricing information on the day of their oral presentation. AR 396.

The RFQ explained that the NSF would use confidence ratings of "high confidence, some confidence, or low confidence" to rate an offeror's Past Experience, Key Personnel, Technical Capability, and Oral Presentation. AR 397-98. The confidence ratings were defined as follows:

| **High Confidence** | The Government has *high confidence* that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with *little or no* Government intervention. |
|---|---|
| **Some Confidence** | The Government has *some confidence* that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with *some* Government intervention. |
| **Low Confidence** | The Government has *low confidence* that the Offeror understands the requirement, proposes a sound approach, or will be successful in performing the contract *even with* Government intervention. |

AR 761-62 (emphasis in original). Price would be evaluated for reasonableness. AR 398.

The NSF Technical Evaluation Team ("TET") would conduct the evaluations and assign confidence ratings to each of the offerors. *See* AR 568-77, 753-56. The CO, as the Source Selection Authority, would identify any disagreements with the TET's evaluation and conduct a best-value tradeoff. *See* AR 759-72. The NSF would award the BPA to the offeror that "represent[ed] the best value, considering the 'lowest cost alternative' consistent with FAR 8.404(d)." AR 398.

### B.   The Evaluation, Award Decision, and Protest

The NSF received Phase I responses from 14 offerors, including AccelGov and DirectViz. AR 762. The TET completed its evaluation of the Phase I submissions and provided its report to the CO. *Id*. After reviewing the report, the CO advised five offerors, including AccelGov and DirectViz, that they were selected to proceed to Phase II. *Id*. AccelGov and DirectViz each received high confidence ratings for Past Performance, Key Personnel, and Technical Capability. AR 764.

As part of Phase II, AccelGov and DirectViz each provided an oral presentation. AR 763. Following the presentations, the TET assigned AccelGov a low confidence rating and DirectViz a high confidence rating for their respective presentations. AR 753-54, 755-56. In sum, AccelGov's and DirectViz's respective Phase I and II ratings were:

| Offeror | Factor 1- Past Experience | Factor 2- Key Personnel | Factor 3- Technical Capability | Factor 4- Oral Presentation | Factor 5- Price |
|---|---|---|---|---|---|
| AccelGov | High | High | High | Low | [* * *] |
| DirectViz | High | High | High | High | $39,591,970.58 |

AR 764.[4]

Based on the Phase I and Phase II findings and confidence ratings assigned by the TET, the CO "determined that [the DirectViz] quotation represent[ed] the best value to the [g]overnment, price and other factors considered" and that it "reflect[ed] the lowest cost alternative considering the special features required by NSF." AR 772. The NSF announced the award of the BPA to DirectViz on April 8, 2022. AR 776.

AccelGov filed its complaint in this Court on April 22, 2022, challenging the NSF's evaluation and source selection decision as arbitrary, capricious, and contrary to law. Compl. [ECF 1]. DirectViz intervened shortly thereafter. Mot. to Intervene [ECF 10]. The parties filed cross-motions for judgment on the administrative record, which were fully briefed, and oral argument was held on July 26, 2022. *See* Scheduling Order [ECF 14].

## II. JURISDICTION AND STANDING

The Tucker Act grants this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1) (2018). The Tucker Act's waiver of sovereign immunity "covers a broad range of potential disputes arising during the course of the procurement process[,]" including "objections to an award[.]" *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380 (Fed. Cir. 2012). A protestor is an "interested party" if it is "an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013). A direct economic interest is shown if the protestor suffered "a non-trivial competitive injury which can be redressed by judicial relief." *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1351 (Fed. Cir. 2015) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361-62 (Fed. Cir. 2009)). Additionally, the protestor "must show that it was prejudiced by a significant error in the procurement process." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018).

The parties to this litigation do not challenge the Court's jurisdiction over AccelGov's complaint or AccelGov's standing as an interested party. However, the Court "has an obligation to satisfy itself that jurisdiction is proper[.]" *L-3 Commc'ns. Corp. v. United States*, 99 Fed. Cl. 283, 288 (2011) (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 130 (2010)). Based on AccelGov's

---
[4] This table from the administrative record was modified to eliminate offerors that are not relevant to this protest.

complaint and the administrative record filed by the government in this case, the Court is satisfied that it has jurisdiction to render judgment on AccelGov's challenge to the NSF's evaluation and source selection decision and that AccelGov has standing to bring its challenge.

### III. STANDARD OF REVIEW

This Court reviews agency decisions in bid protests using the standard of review set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021). This standard permits a court to set aside an agency's contracting decision if the protestor shows that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2018); *see Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020). The Court may set aside an award if "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020). However, "the reviewing court should not substitute its judgment for that of the agency[] but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 559 (2012), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The protestor bears the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency decision. *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 124 (2021); *see also PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (holding that a disappointed bidder must point to "hard facts" to show that a CO's decision was arbitrary).

Once the protestor shows that the agency erred in its contracting decision, the protestor must then establish that the agency's conduct prejudiced them. *Sys. Studs. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) ("To prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process.").

### IV. DISCUSSION

AccelGov argues that the NSF used unstated evaluation criteria in its evaluation of its key personnel, engaged in disparate treatment in its evaluation of AccelGov's and DirectViz's proposed technical capabilities, and performed an unreasonable evaluation of AccelGov's oral presentation. AccelGov also argues that the CO's best-value tradeoff analysis and source selection decision were irrational and inconsistent with the stated evaluation scheme. Based on the record, the Court finds that the NSF's evaluation, best-value tradeoff analysis, and source selection decision were reasonable and consistent with the terms of the RFQ, and, therefore, the Court will not disturb the NSF's determinations.[5]

---

[5] Because the Court finds that the NSF did not commit any of the alleged errors, the Court does not address whether AccelGov was prejudiced. *See Sys. Studs.*, 22 F.4th at 997 (stating that a decision to set aside a contract award is a "two-step process" with the first step asking whether the agency's actions were arbitrary and, if so, the second step asking whether the agency's arbitrary actions prejudiced the protestor).

### A. The NSF Did Not Use Unstated Evaluation Criteria When It Evaluated AccelGov's Proposed Operations Manager.

In its Phase I evaluation, the TET assigned AccelGov a high confidence rating for its proposed key personnel. AR 570. However, it stated in its evaluation findings that AccelGov's "quoted Operations Manager does not have [the] minimum years' experience in the Operations Manager role" and that this lowered expectations of success. *Id*. In its best-value tradeoff analysis, the CO acknowledged that AccelGov's quoted Operations Manager did not have the minimum experience whereas DirectViz's quoted Operations Manager's experience exceeded the required qualifications. AR 770. Consequently, the CO stated that she did "not agree with the high confidence rating" assigned by the TET because "AccelGov did not meet the minimum requirements for [the Key Personnel factor]." *Id*. AccelGov argues that the NSF applied unstated evaluation criteria by treating the RFQ's preference that the quoted Operations Manager have a minimum of seven years' experience "as a minimum requirement and negatively evaluated Accelgov's quote on that basis." Pl.'s Mot. for J. on the Admin. R. [ECF 27] at 14.[6] AccelGov further argues that the NSF unreasonably focused on the titles held by its quoted Operations Manager and failed to evaluate "whether his past experience—the work he actually did, regardless of title—gave him the necessary experience." *Id*. at 10.

An agency's evaluation of proposals must be consistent with the standards set forth in the solicitation. 10 U.S.C. § 2305; FAR 15.305(a). The application of unstated evaluation criteria renders an agency's decision arbitrary and capricious. *See NVE, Inc. v. United States*, 121 Fed. Cl. 169, 180 (2015) (stating that an offeror can challenge an agency's analysis as "arbitrary, capricious, or an abuse of discretion" when the agency relies on unstated evaluation criteria). To succeed on an unstated evaluation criteria claim, a protester must show that "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed[.]" *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

The record shows that the NSF did not use a significantly different basis in evaluating AccelGov's proposed Operations Manager than was disclosed in the RFQ. For the Operations Manager, the RFQ required the following: "[d]emonstrated experience as an Operations Manager (preferred minimum of 7 years of experience)." AR 420. Offerors were required to submit a resume, not exceeding two pages in length, for the Operations Manager position. AR 393. The RFQ stated that the NSF would "evaluate the resumes of the key personnel staff proposed, for the depth and breadth of knowledge, capabilities and/or work experience related to disciplines critical to the successful completion of program objectives described in the statement of work." AR 265. AccelGov submitted the resume of [* * *] for the position of Operations Manager. *See* AR 512-13. In its evaluation, the TET determined that [* * *] did not possess the preferred minimum years of experience in the Operations Manager role. AR 570. This determination is supported by [* * *]'s resume.

[* * *]'s resume lists only one position with the title of Operations Manager. *See* AR 512-13. This position listing is accompanied by a detailed description of the duties that he

---

[6] All page numbers in the parties' briefings refer to the page number generated by the CM/ECF system.

performed for approximately two years from February 2019 to the date AccelGov submitted its proposal in October 2021. AR 512. This two-year period is well short of the preferred minimum of seven years' experience. Prior to working as an Operations Manager, [* * *] held the position of [* * *] Manager from November 2017 to February 2019. AR 512-13. This position listing is also accompanied by a detailed description of the duties that he performed. *Id*. It is conceivable that the TET could have determined that the duties performed by [* * *] in the [* * *] Manager position were equivalent to those performed by an Operations Manager. However, even if the TET were to have credited [* * *] with having demonstrated experience as an Operations Manager during his tenure as [* * *] Manager, it would provide only an additional two years of demonstrated experience, which, together with his Operations Manager position, would amount to four years of experience—three years short of the preferred minimum. None of the other positions listed on [* * *]'s resume include the Operations Manager title or otherwise provide a description of his duties.[7] *See* AR 513. Based on the contents of [* * *]'s resume, it was therefore reasonable for the TET to conclude that AccelGov's quoted Operations Manager did not possess the preferred minimum of seven years of experience. Since the RFQ contained a stated preference that the Operations Manager have a minimum of seven years of experience, the NSF did not employ unstated evaluation criteria. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)); *Sophion Bioscience, Inc. v. United States*, 154 Fed. Cl. 414, 422 (2021) (finding the government did not use unstated evaluation criteria when it evaluated proposals based on the unambiguous text of the RFQ).

If the NSF had treated the RFQ's stated *preference* for an Operations Manager with a minimum of seven years of experience as a *requirement*, the NSF would have determined that AccelGov was ineligible for award due to its failure to meet the experience requirement. *See* AR 266 ("At any time prior to selection, including upon receipt of quotation, the Government may exclude a quotation from further consideration for any material failure to follow instructions[.]"); *E.W. Bliss*, 77 F.3d at 449 ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable"); *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037-38 (Fed. Cir. 2009); *DigiFlight, Inc. v. United States*, 150 Fed. Cl. 650, 657 (2020). Instead, the TET assigned AccelGov a high confidence rating for the Key Personnel factor despite its finding that AccelGov's quoted Operations Manager lowered expectations of successful performance because he did not possess the preferred minimum years of experience. *See* AR 570. Additionally, while the CO acknowledged the TET's finding and, as a result, stated her disagreement with the high confidence rating, the CO did not eliminate AccelGov from consideration on this ground. *See* AR 770. Thus, the record does not support

---

[7] If [* * *]'s experience in these other positions involved duties that were relevant to the Operations Manager role, AccelGov had the obligation to include descriptions of his experience in these positions so that the NSF could appropriately evaluate whether the duties that he performed demonstrated that he was capable of performing the duties of an Operations Manager. *See Harmonia Holdings Grp., LLC v. United States*, 136 Fed. Cl. 298, 308 (2018) ("The offeror bears the burden of presenting an adequately written proposal that satisfies the requirements of the solicitation.") (quoting *Mercom, Inc. v. United States*, 131 Fed. Cl. 32, 40 (2017)).

AccelGov's argument that the NSF treated the RFQ's stated preference as a minimum requirement.

### B. The NSF Did Not Treat AccelGov's and DirectViz's Proposed VIP Support Approaches or Training Programs Unequally.

The TET also assigned a high confidence rating to AccelGov and DirectViz for the Technical Capability factor. AR 571, 575. Nevertheless, AccelGov argues that the NSF "engaged in unequal treatment when it treated substantively indistinguishable aspects of AccelGov's and DirectViz's quotes differently." [ECF 27] at 16. AccelGov asserts that the NSF overlooked several benefits in AccelGov's quote that it recognized in DirectViz's quote when the NSF was evaluating their respective approaches for providing VIP support. *Id*. at 11-15. Additionally, AccelGov asserts that the NSF treated the training programs offered by AccelGov and DirectViz unequally. *Id*. at 15-16.

The FAR requires that offerors "receive impartial, fair, and equitable treatment." FAR 1.602-2(b). Therefore, an agency decision is arbitrary and capricious when it results from the unequal treatment of the offerors. *See CliniComp Int'l Inc., v. United States*, 117 Fed. Cl. 722, 742 (2014) (stating that "unequal treatment is fundamentally arbitrary and capricious, and violates . . . full and open competition[.]"). However, "[a]n agency is under no obligation to assign dissimilar proposals the same evaluation rating." *Off. Design Grp.*, 951 F.3d at 1372 (citing FAR 1.102-2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.")). To prove unequal treatment, a protestor must demonstrate that the relevant elements in its proposal were "substantively indistinguishable or nearly identical from those contained in other proposals." *Id.* (quotations omitted). If the protestor demonstrates that the relevant proposal elements are substantively indistinguishable, the Court may then compare and analyze "the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Id.* On the other hand, if the protestor fails to demonstrate that the proposal elements are substantively indistinguishable, the Court is not appropriately positioned to analyze the agency's treatment of proposals because doing so would involve second-guessing the agency's discretionary determinations underlying its technical ratings. *See Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017).

#### 1. The NSF's Evaluation of VIP Support Approaches

The RFQ required that offerors "[d]escribe [their] approach to providing Very Important Person (VIP) Support." AR 393. When evaluating quotes, the TET found that DirectViz's quote "demonstrate[d] a firm understanding of VIP support expectations (e.g., [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *])." AR 575. AccelGov asserts that its proposed approach was "substantively the same" with respect to [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *  * *]. [ECF 27] at 20. Therefore, AccelGov argues that the NSF engaged in unequal treatment when it recognized these aspects of DirectViz's proposal and failed to recognize the same aspects in its proposal. *Id*.

AccelGov misinterprets NSF's finding on DirectViz's approach. The TET determined that DirectViz's quoted approach demonstrated a "firm understanding of VIP Support Expectations[,]" not based solely on its approach to "[* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ][,]" but instead based on DirectViz's entire approach to VIP Support. *See* AR 575. With its use of "e.g." before its listed expectations, the NSF's reference to these individual aspects are clearly intended as examples of its expectations for VIP support. *See Black's Law Dictionary*, (11th ed. 2019) (defining "e.g." as "[f]or example"). Furthermore, the performance work statement provided with the RFQ requires that offerors meet these expectations when performing VIP support services. *See* AR 328-29. Thus, any sensible offeror would be sure to address these expectations for VIP support as part of their quotation. Consequently, AccelGov's and DirectViz's quotations naturally share similarities with respect to these expectations. It does not follow, however, that their respective approaches to VIP Support are substantively indistinguishable.

To the contrary, AccelGov's and DirectViz's respective proposed approaches to VIP support have substantive differences that permit the NSF to conclude that DirectViz's proposed approach reflects a firm understanding of the VIP support expectations and to also not assign the same finding to AccelGov's proposed approach. For instance, DirectViz proposed a "[* * * * * * * * * * * * * * * * *]" to ensure that the "[* * * * * * * * * * * * * * * * * * * * * * *] [,]" *see* AR 559, whereas AccelGov proposed a [* * * * * * * * * * * * * * * * * * ] for "[* * *]," *see* AR 522. DirectViz also proposed an "[* * * * * * * * * * * * * * * * * * * * *]" [* * * * * * * * * * * * * * * * *] and a [* * * * * * * * *], *see* AR 559-61, and AccelGov did not propose a [* * * * * * * * * * * * * ] VIP support, *see* AR 522-24. In addition to these differences, there are several other notable differences buried within the respective approaches. *Compare* AR 523 *with* AR 559 (AccelGov and DirectViz use different flowcharts to demonstrate how they would each handle VIP support requests); *compare* AR 522-23 *with* AR 559-60 (AccelGov and DirectViz describe their respective VIP support team staffs with different levels of detail); *see* AR 561 (DirectViz provides an additional flowchart to demonstrate how its [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]). Because AccelGov's and DirectViz's proposed approaches are not substantively indistinguishable, the Court is unable to analyze the NSF's evaluation of the proposed approaches without interfering with the NSF's broad discretion to determine what proposed features constitute an advantage over others. *See Enhanced Veterans*, 131 Fed. Cl. at 588 (2017); *Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 19 (2003) ("The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals.").

2. The NSF's Evaluation of the Proposed Training Programs

AccelGov and DirectViz each proposed training programs as part of their quotations. *See* AR 525-26 (AccelGov's training program); AR 559-60 (DirectViz's training program). When evaluating AccelGov's proposed training program, the TET found that the program lowered expectations of success because "[a]lthough [a] training plan to [* * * * * * * * * * * * * * * * * * * * * * * * * * * * *] work [would] be helpful to [the NSF] during the performance of the contract, the time it [would] take to develop comprehensive training plans [would] hinder the ability to assist customers from day one unless AccelGov capture[d] incumbent personnel." AR 572. With respect to DirectViz's training program, the NSF found that its "planned use of [an]

[* * *] to provide training for staff that will support [* * * * * * ]" raises the expectations of success. AR 576. AccelGov argues that the NSF engaged in unequal treatment in its evaluation of the respective training programs because "both offerors offered to design a training program" for which "the development and training process would take place during contract performance." [ECF 27] at 21. Yet, the NSF "only noted its concern about the time that design/development process would take in its evaluation of AccelGov's quote." *Id*.

AccelGov's unequal treatment argument regarding the training programs fails because AccelGov's and DirectViz's proposed training programs relate to different aspects of the performance work statement and are substantively distinguishable. In its quote, AccelGov proposed to "develop and maintain[] comprehensive training plans, training guides, and required documentation for [* * * * * * * * * * * * * *][.]" AR 526. AccelGov's training program is focused on ensuring that its [* * * * * * * * * * *] is fully trained and has the necessary understanding of the [* * * * * * * * * * * * * *]. *See* AR 525-26. This relates to the NSF's eBusiness support requirements. AR 329. On the other hand, DirectViz's training program consists of an [* * * * * * * * * * * * * * *] designed to "[* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]." AR 560. The focus of DirectViz's training program is to improve the [* * * * * * * * *] and enhance the [* * * * * * * * * * * *]. *Id*. This relates to the NSF's [* * * * * * * * * * * * * *]. AR 328-29. While it may be true that each training program would be developed during contract performance, AccelGov's training program relates to [* * * * * * * * * * * * * * * * * *] and DirectViz's program relates only to [* * * * * * *]. Because AccelGov's and DirectViz's proposed training programs are different, the Court is not able to comparatively analyze the NSF's treatment of the programs. *See Off. Design*, 951 F.3d at 1372; *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 294 (2022).

Further, the NSF's finding with respect to AccelGov's training program had a rational basis. AccelGov proposed to develop a training program to train its personnel on the NSF's [* * * * * * * * * * * * * *] as part of its quoted approach. AR 526. The time that it would take to develop such a program could impact AccelGov's ability to provide customer support services on the NSF's [* * * * * * * * * * *] at the outset of contract performance. Because this finding is reasonable, the Court will not second-guess it. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Weeks Marine*, 575 F.3d at 1371-72.

  **C.**  **The NSF's Evaluation of AccelGov's Oral Presentation Was Not Arbitrary.**

The TET assigned AccelGov a low confidence rating for its oral presentation. AR 753. In support of its rating, the TET stated that AccelGov had proposed a reduction in staff that "does not reflect an understanding of [the] NSF's customer expectations and culture" and that the proposed efficiencies "would present significant risk to [the] NSF [because] eBusiness services are central to the Agency's mission and key to customer satisfaction with Service Desk support." AR 753-54. The TET further stated that AccelGov's "improvements related to [* * * * * * * * * * * * * * * * * *] did not include any details about the approach or how these [* * * * * * * *] would translate to service improvements." *Id*. AccelGov argues that these findings were arbitrary because its proposed approach was "in harmony with [the NSF]'s objectives as set forth in the

RFQ and [the NSF]'s understanding of AccelGov's approach was unreasonable." Pl.'s Reply [ECF 31] at 12.

When a protestor alleges the agency's decision was arbitrary, the Court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quotations and citations omitted). "[T]he disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp.*, 554 F.3d at 1037 (quotations and citations omitted). There is no "universal test" as to the sufficiency of an agency's explanation for its decision and "no one factor is dispositive." *Yang Enters., Inc. v. United States*, 156 Fed. Cl. 435, 449 (2021) (citing *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 111–12 (2020)). An agency action is arbitrary when "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *State Farm*, 463 U.S. at 43).

During its oral presentation, AccelGov stated that it "reduced the total labor hours by [* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]." AR 616. AccelGov further stated that the proposed [* * *] reduction in full-time staff resulted in an estimated reduction of [* * * * * * * * * * * * * * * * * * * * * * * * * * * * ]. *Id*. AccelGov had not previously mentioned staff reductions as part of its quote. In response to this revelation, the NSF asked two clarifying questions. AR 595. First, the NSF asked AccelGov to "advise if [it] intend[ed] to reduce the [Full Time Employee] count across the option years." *Id*. Second, the NSF asked AccelGov to "elaborate on the strategy" of using [* * * *] to support the staff reductions. *Id*. In response to the first question, AccelGov confirmed that it intended to reduce staffing across the option years and explained that it would accomplish the reductions by "[* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]." AR 707. In response to the second question, AccelGov stated that it could "[* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *]. *See* AR 707-10. In addition, AccelGov provided several examples of how it could use [* * * * * * * * * * * * * *] to achieve these objectives. *See id*.

The Court finds that the NSF had a rational basis for its findings with respect to AccelGov's oral presentation. The RFQ made clear that information technology services were critical to the NSF's mission and that *reliable operations* and *superior customer service* were primary objectives. *See* AR 273 ("Because agency IT systems and services are so critical to the mission, the Foundation emphasizes two primary service objectives in its provision of IT support services: secure, reliable operations and superior customer service."). Thus, it is not surprising that the NSF had concerns with AccelGov's proposed plan to reduce staff—especially when it was first revealed to the NSF during AccelGov's oral presentation. In an apparent attempt to address its concerns, the NSF questioned AccelGov to gain a better understanding of its plan for implementing the staff reductions. *See* AR 595. It appears, however, that AccelGov's responses did not satisfactorily address the NSF's concerns. Based on a review of the transcript from AccelGov's oral presentation, the NSF had reasonable grounds to conclude that AccelGov's responses were insufficient because AccelGov's explanations as to how it would implement staff

reductions without impacting customer service were vague. *See* AR 709-711; *PAE Aviation & Tech. Servs., LLC v. United States*, 156 Fed. Cl. 454, 464-65 (2021) (finding an agency's decision to assign a weakness for not adequately explaining labor efficiencies rational). Because the NSF's evaluation of AccelGov's oral presentation was consistent with the RFQ evaluation method for oral presentations and the NSF's findings with respect to AccelGov's proposed staff reductions had a rational basis, the Court will not disturb the NSF's conclusions. *See Advanced Data Concepts*, *Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (holding that the Court must "sustain an agency action evincing rational reasoning and consideration of relevant factors.").

### D. The Source Selection Decision was Not Arbitrary or Inconsistent with the Stated Evaluation Criteria.

In its best-value tradeoff and source selection decision, the CO determined that "establishment of a BPA with [DirectViz] represents the best value and results in the lowest overall cost alternative to meet the Government's needs." AR 769. AccelGov challenges the NSF's decision as arbitrary, arguing that it "failed to follow the RFQ's stated evaluation scheme" and that "the CO should have given more consideration to the savings associated with AccelGov's proposal." [ECF 27] at 29. AccelGov's quote was $[* * * * * *] less than DirectViz's quote. *See* AR 769.

The RFQ stated that the award would be made to the offeror that "represents the best value, considering the 'lowest cost alternative' consistent with FAR 8.404(d)." AR 398. FAR 8.404(d) states that "[b]y placing an order against a schedule contract using the procedures in [FAR] 8.405, the ordering activity has concluded that the order represents the best value (as defined in FAR 2.101) and results in the lowest overall cost alternative (considering price, special features, administrative costs, etc.) to meet the Government's needs." FAR 8.405-3(b)(2)(viii) requires that the agency "establish the BPA with the schedule contractor(s) that represents the best value." In conducting a best-value determination, the agency must document its "rationale for any tradeoffs in making the selection." FAR 8.405-3(a)(7)(viii).

When reviewing an agency's best-value tradeoff and selection decision, the Court will analyze it "to determine whether it is reasonable and within the agency's discretion." *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012). Procurement officials have substantial discretion when determining which quotation represents the best-value to the agency in a procurement under FAR subpart 8.4. *Sigmatech, Inc. v. United States*, 141 Fed. Cl. 284, 321 (2018). The Court will not overturn a procurement official's determination when the procurement official "reasonably exercises independent judgement and makes a business decision justifying the award." *Id*.

In this instance, the CO determined that DirectViz's quoted approach for the information technology services justified paying a higher price. *See* AR 769-70. The CO explained:

> While the DirectViz quote is higher-priced relative to the quotes from AccelGov . . . it received a higher confidence rating under the Oral Presentation Factor 4 and otherwise received the same

> confidence ratings under Factors 1 through 3. Although Factor 4 is
> the least important non-price factor, it is more important than Price
> Factor 5.

AR 770. This explanation is consistent with the RFQ evaluation criteria, which provided that "price is the least important factor" and that "[w]hen combined, the non-price factors are significantly more important than price." AR 397. In the decision documentation, the CO acknowledged that "before [the] NSF can select a higher-priced quote that has been rated non-price superior to a lower-priced but acceptable one, the decision must be supported by a rational explanation of why the higher-rated quote, is, in fact, superior, and explain why the non-price superiority warrants paying a price premium." AR 769. In this regard, the CO conducted a comparison of DirectViz's and AccelGov's quotes under each non-price evaluation factor and identified "differences and discriminators." AR 770. In her comparison, the CO noted that she "did not discern any significant differences" under the Past Experience factor. However, she did document differences under the Key Personnel, Technical Capability, and Oral Presentation factors. Based on these differences, she explained that "in peering behind the confidence ratings, it is my opinion that it [is] worth paying the extra $[* * ** * *]. . . price premium[]" for DirectViz's quote. AR 770. Having determined that the superiority of DirectViz's quote warranted paying the price premium, the CO concluded that DirectViz's quote "represent[ed] the best value to the Government, price and other factors considered" and that "it reflect[ed] the lowest overall cost alternative considering the special features required by NSF." AR 772. The record shows that the CO engaged in a meaningful tradeoff analysis, considered the benefits of DirectViz's higher-priced quotation in comparison to AccelGov's, and documented her business judgments when deciding to select DirectViz despite its higher price. Because the CO properly adhered to the RFQ evaluation criteria and reasonably exercised her discretion, the Court will not meddle with the CO's best-value determination. *See Distributed Sols.*, 106 Fed. Cl. at 24-25.[8]

## V.     INJUNCTIVE RELIEF

AccelGov requests that the Court enter a permanent injunction enjoining performance of the BPA awarded to DirectViz and requiring that the NSF reperform the evaluation. [ECF 27] at 31-33. When deciding if a permanent injunction is warranted, the Court considers whether: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 103. Achieving success on the merits "is a necessary element for a permanent injunction." *Dell Fed. Sys.*, 906 F.3d at 999. In this case, AccelGov has not succeeded on the merits. Therefore, AccelGov is not entitled to a permanent injunction.

---

[8] AccelGov also argues that the CO allowed the alleged evaluation errors to affect the best-value tradeoff. *See* [ECF 27] at 26-28. This argument is derivative of its other challenges to the NSF's evaluation. Because the Court has already rejected AccelGov's challenges to the NSF's evaluation, this argument cannot stand. *See Newimar S.A. v. United States*, 160 Fed. Cl. 97, 133-34 (2022); *Ace-Fed. Reps., Inc. v. United States*, 150 Fed. Cl. 94, 112 (2020).

## VI. CONCLUSION

For the reasons stated above, AccelGov's motion for judgment on the administrative record is **DENIED**, and the government's and DirectViz's respective cross-motions are **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly.

Some information contained in this Opinion may be considered protected information subject to the Protective Order entered on April 28, 2022. [ECF 15]. Accordingly, the Opinion is filed **UNDER SEAL**. The parties **SHALL CONFER** and **FILE** on or before **November 8, 2022**, a joint status report that: identifies the information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz<br>
THOMPSON M. DIETZ, Judge